# No. 22-622

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JONATHAN ROBERTS and CHARLES VAVRUSKA,
Plaintiffs-Appellants,
v.
MARY T. BASSETT, in her official capacity as Commissioner for New York
State Department of Health, NEW YORK CITY DEPARTMENT OF HEALTH
AND MENTAL HYGIENE,
Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of New York
Honorable Nicholas G. Garaufis, District Judge

## APPELLANTS' OPENING BRIEF

WENCONG FA
CALEB R. TROTTER
ANASTASIA BODEN
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
WFa@pacificlegal.org
CTrotter@pacificlegal.org
ABoden@pacificlegal.org
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT .......................................................2

ISSUES PRESENTED.........................................................................3

STATEMENT OF THE CASE ..............................................................3

   I.   The Surge in COVID-19 Cases and Treatment Shortages...........................4

   II.   Defendants' Race-Based Directives for Allocating
       COVID-19 Treatments ............................................................6

   III   Plaintiffs Jonathan Roberts and Charles Vavruska ......................................13

   IV.  Proceedings Below ..............................................................14

STANDARD OF REVIEW ................................................................16

SUMMARY OF ARGUMENT ...........................................................16

ARGUMENT ..................................................................................19

   I.   Plaintiffs Have Article III Standing to Raise Their Claim in
      Federal Court .....................................................................19

     A.   Plaintiffs Are Injured by Defendants' Directives....................................19

     B.   Plaintiffs' Injury Is "Fairly Traceable" to Defendants'
        Race-Based Directives..............................................................24

     C.   Plaintiffs' Injury Is Redressable by a Favorable Court Decision.............27

     D.   Plaintiffs' Challenge to the Directives Is Not Moot................................29

   II.   Plaintiffs Are Entitled to Preliminary Relief .............................................31

     A.   Plaintiffs Are Likely to Succeed on the Merits.......................................32

       1.   Race-Based COVID-19 Directives Do Not Further a
          Compelling Interest ..............................................................33

       2.   Race-Based COVID-19 Directives Are Not
          Narrowly Tailored ................................................................34

     B.   The Remaining Preliminary Injunction Factors Are Satisfied.................38

CONCLUSION ...............................................................................39

CERTIFICATE OF COMPLIANCE.....................................................40

CERTIFICATE OF SERVICE ............................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)................................................................33

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
815 F.3d 105 (2d Cir. 2016) ..............................................29

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003) ...................................2, 22, 23

*Bennett v. Spear*,
520 U.S. 154 (1997)......................................17, 24, 26

*Cacchillo v. Insmed, Inc.*,
638 F.3d 401 (2d Cir. 2011) ...............................16, 31

*Carey v. Klutznick*,
637 F.2d 834 (2d Cir. 1980) ...............................39

*Carter v. HealthPort Technologies, LLC*,
822 F.3d 47 (2d Cir. 2016) ................................23, 24

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)......................................33, 35, 36

*Comer v. Cisneros*,
37 F.3d 775 (2d Cir. 1994) .................................20

*Conn. Dep't of Envtl. Prot. v. OSHA*,
356 F.3d 226 (2d Cir. 2004) ..............................38

*Dean v. Town of Hempstead*,
527 F.Supp.3d 347 (E.D.N.Y. 2021) .........................18, 27

*Diaz v. N.Y.C. Bd. of Elections*,
335 F.Supp.2d 364 (E.D.N.Y. 2004) ........................38

*Gratz v. Bollinger*,
539 U.S. 244 (2003).......................................18, 20, 35

*Grutter v. Bollinger*,
539 U.S. 306 (2003).......................................20, 35, 36

*Irish Lesbian & Gay Org. v. Giuliani*,
143 F.3d 638 (2d Cir. 1998) ..............................29, 30

*Johnson v. California*,
543 U.S. 499 (2005)........................................................................33

*Larson v. Valente*,
456 U.S. 228 (1982)........................................................................28

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006)........................................................................37

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)............................................................16, 17, 27

*Mitchell v. Washington*,
818 F.3d 436 (9th Cir. 2016) ........................................................32

*Nat'l Council of La Raza v. Mukasey*,
283 Fed. Appx. 848 (2d Cir. 2008)................................................26

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
508 U.S. 656 (1993)....................................................................17, 19

*New York Progress and Protection PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) ..........................................................16

*New York v. Dep't of Homeland Security*,
969 F.3d 42 (2d Cir. 2020) ......................................................21, 31

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................38

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007)....................................................................32, 33

*Roberts v. Bassett*, No. 22-710, 2022 WL 785167
(E.D.N.Y. Mar. 15, 2022) ..................................1, 4, 15, 21, 25, 30

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) ......................................................17, 24

*Stilwell v. Office of Thrift Supervision*,
569 F.3d 514 (D.C. Cir. 2009)......................................................21

*Town of Babylon v. Federal Housing Finance Agency*,
699 F.3d 221 (2d Cir. 2012) ..........................................................29

*Van Wie v. Pataki*,
267 F.3d 109 (2d Cir. 2001) ..........................................................31

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008)................................................................................31

**Other Authorities**

Centers for Disease Control and Prevention, *Potential Rapid Increase
   of Omicron Variant Infections in the United States* (updated Dec.
   20, 2021), https://www.cdc.gov/
   coronavirus/2019-ncov/science/forecasting/mathematical-
   modeling-outbreak.html.......................................................................4, 5

City of New York, Executive Order No. 83 (Apr. 28, 2022),
   https://www1.nyc.gov/office-of-the-mayor/news/083-
   003/emergency-executive-order-83 ....................................................14

Ellis, Ralph, *NYC Raises COVID Alert Level to Medium*, WebMD,
   May 2, 2022, https://www.webmd.com/vaccines/
   covid-19-vaccine/news/ ......................................................................13

Flores, Jessica, *Uber and Lyft have dropped their mask mandates*, SF
   Chronicle, Apr. 19, 2022,
   https://www.sfchronicle.com/bayarea/article/Uber-drops-mask-
   mandate-17090505.php........................................................................28

GlaxoSmithKline, GSK and Vir Biotechnology announce United
   States government agreement to purchase additional supply of
   sotrovimab, authorised for the early treatment of COVID-19, Jan.
   11, 2022, https://www.gsk.com/en-gb/media/press-releases/gsk-
   and-vir-biotechnology-announce-united-states-government-
   agreement-to-purchase-additional-supply-of-sotrovimab/ ..................6

Levine, Jon, *NYC will consider race when distributing life-saving
   COVID treatments*, New York Post, Jan. 1, 2022,
   https://nypost.com/2022/01/01/nyc-considering-race-in-
   distributing-life-saving-covid-treatment/...........................................12

Miller, Zeke, *White House expands availability of COVID antiviral
   treatment amid ample supply*, Associated Press, Apr. 26, 2022,
   https://www.pbs.org/newshour/health/
   white-house-expands-availability-of-covid-antiviral-treatment-
   amid-ample-supply .............................................................................13

NYC Health, *COVID-19 Data: Trends and Tools, Long-term Trends,
   cases by day,* https://www1.nyc.gov/site/doh/covid/
   covid-19-data-totals.page.....................................................................4

iv

NYC Health, *Omicron Variant: NYC Report for January 13, 2022,* https://www1.nyc.gov/assets/doh/downloads/ pdf/covid/omicron-variant-report-jan-13-22.pdf.................................................5

NYC Health, "Paxlovid is Available for COVID-19 Treatment in New York City" (2022 Health Advisory #2), https://www1.nyc.gov/assets/doh/downloads/pdf/han/advisory/202 2/covid-paxlovid-available.pdf...........................................................................16

Office of the Assistant Secretary for Preparedness and Response, *Sotrovimab*, https://aspr.hhs.gov/COVID-19/Therapeutics/Products/Sotrovimab/Pages/default.aspx .................................6

U.S. Dep't of Health and Human Services, *Biden Administration Secures 10 Million Courses of Pfizer's COVID-19 Oral Antiviral Medicine as Additional Tool to Reduce Hospitalizations and Save Lives*, Nov. 18, 2021, https://www.hhs.gov/about/news/ 2021/11/18/biden-administration-secures-10-million-courses-pfizers-covid-19-oral-antiviral-medicine-as-additional-tool-reduce-hospitalizations-save-lives.html.........................................................11

U.S. FDA, *Coronavirus (COVID-19) Update: FDA Authorizes Additional Oral Antiviral for Treatment of COVID-19 in Certain Adults*, Dec. 23, 2021, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-additional-oral-antiviral-treatment-covid-19-certain.........................................5

U.S. FDA, *Coronavirus (COVID-19) Update: FDA Authorizes First Oral Antiviral for Treatment of COVID-19*, Dec. 22, 2021, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-oral-antiviral-treatment-covid-19 .....................................................5

Utah Dep't of Health, *UDOH announces changes to risk assessment process for accessing scarce COVID-19 treatments* (Jan. 21, 2022), https://health.utah.gov/featured-news/udoh-announces-changes-to-risk-assessment-process-for-accessing-scarce-covid-19-treatments.................................................................................19, 37

Wash. Dep't of Health, *Interim-DOH Guidance on Prioritization for Use of AntiSARS-CoV-2 Monoclonal Antibodies* (Apr. 18, 2022), https://doh.wa.gov/sites/default/files/2022-02/821-155-InterimMonoclonalAntibodyGuidance.pdf .......................................37

## INTRODUCTION

This case involves a clear-cut dispute between the parties: Plaintiffs Jonathan Roberts and Charles Vavruska—lifelong New York City residents—firmly believe that their race should play no part in whether they are able to obtain potentially lifesaving treatments for COVID-19 and seek equal access to that treatment without regard to their immutable characteristics. Defendants, New York State and New York City health departments, insist on using racial preferences in allocating those treatments.

Indeed, New York City proclaims that employing a race-neutral system for allocating such treatments would be "akin to intentionally maintaining a racially discriminatory policy for distributing live-saving drugs." *Roberts v. Bassett*, City Opp. to Pltfs' Mot. for Prelim. Inj., No. 22-710, ECF No. 20, at 12–13 (E.D.N.Y. filed Feb. 25, 2022). Last December, when confronted with "severe supply shortages" of the antivirals, App. 17, and "largest wave of reported cases yet," App. 52–53, Defendants issued directives to tens of thousands of individuals, including "licensed physicians, nurse practitioners, and physicians' assistants, " App. 247, instructing them to prioritize scarce COVID treatments to individuals on the basis of whether they have a chronic condition, whether they are obese or overweight, and whether they are non-white or Hispanic. App. 26–34; 39–44. Plaintiffs contend that these directives violate their equal protection rights.

1

The district court dismissed the case because it believed that Plaintiffs—white, non-Hispanic residents of New York City—did not have Article III standing to pursue their equal protection claims. The district court was wrong to do so. As this Court has held, "the relevant 'injury' for standing purposes may be exposure to a sufficiently serious risk of medical harm—not the anticipated medical harm itself." *Baur v. Veneman*, 352 F.3d 625, 628, 641 (2d Cir. 2003). That injury is traceable to Defendants' directives, which plainly instruct medical professionals to discriminate on the basis of race, and would be redressed by a favorable court decision.

The district court also observed that there is currently an adequate supply of COVID-19 treatments. But the State acknowledges that "supply chain disruptions can happen at any time," App. 82–83, and its race-based directive has not been superseded by another, more recent directive. App. 268. Thus, there remains a live controversy between the parties in this case.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over Plaintiffs' constitutional challenge to Defendants' directives for allocating COVID-19 treatments under 28 U.S.C. §§ 1331, 1343. This appeal arises from the district court's final order dismissing the case pursuant to Federal Rule of Civil Procedure 12(b)(1) and declining to consider Plaintiffs' Motion for Preliminary Injunction. App. 251–70.

2

The district court's order was entered on March 15, 2022, *id.*, and Plaintiffs filed a timely notice of appeal on March 23, 2022. App. 271–72.

## ISSUES PRESENTED

1.    Whether Plaintiffs have Article III standing to pursue their case.

2.    Whether Plaintiffs are entitled to a preliminary injunction enjoining Defendants from enforcing the race-based directives.

## STATEMENT OF THE CASE

On February 8, 2022, Plaintiffs Jonathan Roberts and Charles Vavruska filed this action in the United States District Court for the Eastern District of New York. Plaintiffs challenge two similar directives, issued by the New York State Department of Health and the New York City Department of Health and Mental Hygiene,[1] which instructed providers to use race as a factor in allocating COVID-19 treatments during times of scarcity. Plaintiffs alleged that the directives violate the Equal Protection Clause of the Fourteenth Amendment, and sought injunctive relief, declaratory relief, and nominal damages. They moved for a preliminary injunction on February 18, 2022, and the district court held a hearing on the motion on March 2, 2022.

---

[1] For ease of reference, Plaintiffs will refer to Plaintiffs-Appellants Jonathan Roberts and Charles Vavruska as "Plaintiffs," and Defendants Mary Bassett, in her official capacity as Commissioner of the New York State Department of Health, and New York City Department of Health and Mental Hygiene collectively as "Defendants" or individually as the State or City.

On March 15, 2022, Judge Nicholas G. Garaufis issued the district court's final memorandum and order, dismissing the case for lack of jurisdiction and declining to consider Plaintiffs' Motion for Preliminary Injunction. The opinion is unreported, *see Roberts v. Bassett*, No. 22-710, 2022 WL 785167 (E.D.N.Y. Mar. 15, 2022) (Garaufis, J.), and is reproduced at App. 251–70. This appeal followed.

## I.    The Surge in COVID-19 Cases and Treatment Shortages

In Fall 2021, COVID-19 appeared to be behind us. Vaccinations became widely available by April 2021, and the number of cases predictably declined shortly thereafter. From a peak of more than 8,000 reported and confirmed cases per day in New York City in early January 2021, the tally had fallen to under 200 per day by late June. NYC Health, *COVID-19 Data: Trends and Tools, Long-term Trends, cases by day*.[2] But the good news was short-lived.

In November 2021, the Omicron variant of COVID-19 was identified. Centers for Disease Control and Prevention, *Potential Rapid Increase of Omicron Variant Infections in the United States* (updated Dec. 20, 2021).[3] The CDC alerted of "a rapid increase in infections" resulting from the variant's "increased transmissibility and the ability of the variant to evade immunity conferred by past infection or

---

[2] *Available at* https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page.
[3] *Available at* https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/mathematical-modeling-outbreak.html.

vaccination." *Id*. Its warning proved correct. In New York City, it took only five weeks for Omicron to become the dominant variant in reported cases, compared to 20 weeks for the Delta variant. NYC Health, *Omicron Variant: NYC Report for January 13, 2022* at 2.[4] The number of cases in New York City skyrocketed—from fewer than 2,000 in November to over 40,000 per day in early January 2022. *Id.*; *see also* App. 52–53 ¶ 11 (noting that the number of new cases from November 2021 to January 2022 represented the "largest wave of reported cases yet").

Around the same time, the U.S. Food and Drug Administration issued an emergency use authorization for Paxlovid—an oral antiviral treatment for mild to moderate COVID-19 cases. U.S. FDA, *Coronavirus (COVID-19) Update: FDA Authorizes First Oral Antiviral for Treatment of COVID-19*, Dec. 22, 2021.[5] The next day, the FDA also issued an emergency use authorization for another oral antiviral—molnupiravir. U.S. FDA, *Coronavirus (COVID-19) Update: FDA Authorizes Additional Oral Antiviral for Treatment of COVID-19 in Certain Adults*, Dec. 23, 2021.[6] Both drugs, along with previously approved monoclonal antibody

---

[4] *Available at* https://www1.nyc.gov/assets/doh/downloads/pdf/covid/omicron-variant-report-jan-13-22.pdf.

[5] *Available at* https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-oral-antiviral-treatment-covid-19.

[6] *Available at* https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-additional-oral-antiviral-treatment-covid-19-certain.

treatments (sotrovimab),[7] promised to bolster the availability of effective COVID-19 treatments in the United States. But the fight against Omicron was plagued by shortages of the available treatments. Both New York State and New York City noted that there were "severe supply shortages for all COVID-19 outpatient therapeutics," and that the most effective oral antiviral, Paxlovid, "go[es] out of stock frequently." App. 17 ¶ 14.

Responding to the shortage of treatments, Defendants issued directives instructing health care providers to allocate scarce treatments to those who, in Defendants' view, were most in need of them. App. 26–34, 39–44.

## II. Defendants' Race-Based Directives for Allocating COVID-19 Treatments

On December 27, 2021, the New York State Department of Health published a document setting eligibility for COVID-19 treatments and directing New York health care providers and facilities to follow its guidance for prioritizing patients. *See* App. 26–34, "COVID-19 Oral Antiviral Treatments Authorized and Severe

---

[7] *See* GlaxoSmithKline, GSK and Vir Biotechnology announce United States government agreement to purchase additional supply of sotrovimab, authorised for the early treatment of COVID-19, Jan. 11, 2022, *available at* https://www.gsk.com/en-gb/media/press-releases/gsk-and-vir-biotechnology-announce-united-states-government-agreement-to-purchase-additional-supply-of-sotrovimab/. As of April 5, 2022, sotrovimab is no longer authorized for use in treating COVID-19 in light of data showing that it is ineffective against the new BA.2 subvariant. *See* Office of the Assistant Secretary for Preparedness and Response, *Sotrovimab*, *available at* https://aspr.hhs.gov/COVID-19/Therapeutics/Products/Sotrovimab/Pages/default.aspx.

Shortage of Oral Antiviral and Monoclonal Antibody Treatment Products." The document, which was distributed to "health care facilities and prescribing medical professionals in New York, including licensed physicians, nurse practitioners, and physicians' assistants," App. 247, noted "severe resource restrictions" requiring providers to prioritize treatment based on a patient's risk of suffering severe illness. App. 26–34.

The document establishes eligibility criteria for oral antivirals Paxlovid and molnupiravir as follows:

• Age 12 years and older weighing at least 40 kg (88 pounds) for Paxlovid, or 18 years and older for molnupiravir

• Test positive for SARS-CoV-2 on a nucleic acid amplification test or antigen test; results from an FDA-authorized home-test kit should be validated through video or photo but, if not possible, patient attestation is adequate

• Have mild to moderate COVID-19 symptoms

• Patient cannot be hospitalized due to severe or critical COVID-19

• Able to start treatment within 5 days of symptom onset

• Have a medical condition or other factors that increase their risk for severe illness.

*Id.* The document states that "non-white race or Hispanic/Latino ethnicity should be considered a risk factor." *Id.*

In a subsequent guidance document, the Department established five "risk groups," 1A–1E, which determine a person's priority when seeking treatment. *See* App. 35–38, "Prioritization of Anti-SARS-CoV-2 Monoclonal Antibodies and Oral Antivirals for the Treatment of COVID-19 During Times of Resource Limitations." Patients assigned to Group 1A are considered the highest priority, those in Group 1B are the next highest priority, and so on. According to the Guidance, each eligible patient should be assigned to a group and then prioritized within the respective group based on age and number of risk factors. For groups 1D and 1E, providers and facilities can also prioritize based on receipt of a booster shot and time since last vaccination. *See id.*

Group 1A includes individuals of "any age with moderate to severe immunocompromise regardless of vaccine status," "[a]ge 65 and older and not fully vaccinated with at least one risk factor for severe illness," or "[a]ge 65 or older that is a resident of a long-term care facility environment." *Id.* Group 1B includes persons "under 65 years of age and not fully vaccinated with two or more risk factors for severe illness or over 65 and not fully vaccinated (no risk factors.)." *Id.* Group 1C includes persons "under 65 years of age and not fully vaccinated with at least one risk factor for severe illness." *Id.* Group 1D includes individuals "over age 65 and fully vaccinated with at least one risk factor for severe illness." *Id.* Group 1E includes persons "under 65 years of age and fully vaccinated with at least one risk

factor for severe illness or age 65 and older and fully vaccinated with no other risk factors." *Id.*

This scheme makes race determinative in two ways. First, among members in the same risk group, individuals that are non-white or of Hispanic/Latino ethnicity receive higher priority for treatment over others who are of the same age and have the same number of race-neutral risk factors. Second, because race is itself considered a risk factor, being a member of any minority group could move an individual to a higher risk group.

Aside from declaring that "[n]on-white race or Hispanic/Latino ethnicity" are to be considered risk factors, the Department's Guidance does not define "risk factors." Instead, it links to a United States Centers for Disease Control and Prevention (CDC) webpage.[8] That page lists several risk factors that may cause individuals "of any age" to be "more likely to get severely ill from COVID-19," including: cancer; chronic kidney disease; chronic liver disease; chronic lung diseases; dementia or other neurological conditions; diabetes; Down syndrome; heart conditions; HIV infection; an immunocompromised state; mental health conditions; obesity and being overweight; pregnancy; sickle cell disease or

---

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2F www.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

thalassemia; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; substance use disorders; and tuberculosis. Like the Department, the CDC also considers being non-white or Hispanic/Latino to be an independent risk factor. But the CDC does not instruct medical professionals to prioritize patients based on a rote counting of the number of risk factors they possess.

Under the State's directive, a white non-Hispanic person with cancer is treated the same as a non-white or a Hispanic person who is disease-free. Two 66-year-old vaccinated individuals with diabetes who would otherwise have equal standing in Group 1D would see a person of "[n]on-white race or Hispanic/Latino ethnicity" receive priority over a white non-Hispanic person. Race can also determine whether a person is even eligible for oral antivirals or whether similarly situated individuals are put into different risk groups.

New York City follows the state guidance. On December 27, 2021, the City published a health advisory that sets out eligibility criteria for New York City patients who wish to receive oral antiviral treatments and instructs providers on how to prioritize access. App. 39–44, "COVID-19 Oral Antiviral Treatments Authorized and Severe Shortage of Oral Antiviral and Monoclonal Antibody Treatment Products" (Health Advisory #39). Health Advisory #39 instructs health care providers to "[a]dhere to New York State Department of Health (NYS DOH) guidance on prioritization of high-risk patients for anti-SARS-CoV-2 therapies

during this time of severe resource limitations," and instructs providers to "consider race and ethnicity when assessing an individual's risk." *Id.* The City distributed the guidance to "75,000 email addresses aimed at medical providers and other registered individuals." App. 55 ¶ 22.

These directives were part of the government's broader scheme to curate the allocation of COVID treatments. In November 2021, the federal government announced the purchase of 10 million courses of Paxlovid and 3 million courses of Lagevrio (molnupiravir), pending subsequent emergency use authorizations. U.S. Dep't of Health and Human Services, *Biden Administration Secures 10 Million Courses of Pfizer's COVID-19 Oral Antiviral Medicine as Additional Tool to Reduce Hospitalizations and Save Lives*, Nov. 18, 2021;[9] Office of the Assistant Secretary for Preparedness and Response, *Lagevrio*.[10] In turn, the federal government allocated the courses to the various state health departments for distribution. Office of the Assistant Secretary for Preparedness and Response, *Paxlovid*;[11] Office of the Assistant, *Lagevrio*. As a result, the Department was the exclusive supplier of the treatments in New York. And although supplies are now

---

[9] *Available at* https://www.hhs.gov/about/news/2021/11/18/biden-administration-secures-10-million-courses-pfizers-covid-19-oral-antiviral-medicine-as-additional-tool-reduce-hospitalizations-save-lives.html.

[10] *Available at* https://aspr.hhs.gov/COVID-19/Therapeutics/Products/Lagevrio/Pages/default.aspx.

[11] *Available at* https://aspr.hhs.gov/COVID-19/Therapeutics/Products/Paxlovid/Pages/default.aspx.

available more broadly, both the State and the City initially contracted with select pharmacies to supply the treatments to eligible patients. *See* App. 26–34. For instance, Rite Aid was the only provider in Niagara County, *id.*, Kinney Drugs was the only provider in Onondaga County, *id.*, and Alto Pharmacy was the only provider in the City of New York. *See* App. 39–44. The State also reminded individuals that the oral antivirals "may only be prescribed for an individual patient by physicians, advanced practice registered nurses, and physician assistants that are licensed or authorized under New York State law to prescribe drugs in the therapeutic class to which Paxlovid and molnupiravir belong (i.e., anti-infectives)." App. 29.

According to a *New York Post* article published soon after the directives went into effect, the "race-based approach in treatment" soon began "to have real-world consequences." *See* Jon Levine, *NYC will consider race when distributing life-saving COVID treatments*, New York Post, Jan. 1, 2022.[12] A Staten Island doctor filling two prescriptions for Paxlovid claimed that, for the first time in 30 years, he was asked by a pharmacist to disclose the race of his patients before the treatment was authorized.

Although supply shortages of Paxlovid have largely eased in the last few months, doubts linger as to whether shortages could return in the event of another

---

[12] *Available at* https://nypost.com/2022/01/01/nyc-considering-race-in-distributing-life-saving-covid-treatment/.

spike in cases like that seen in December 2021 given the uncertainty of continued funding for the acquisition of the treatments. *See* Zeke Miller, *White House expands availability of COVID antiviral treatment amid ample supply*, Associated Press, Apr. 26, 2022.[13] At the same time, cases in New York City have increased five-fold since March 2022 from a low of around 600 per day to over 3,000 per day as of May 3, 2022, *supra* n.2, triggering an elevated alert level that could result in a return of public health restrictions, Ralph Ellis, *NYC Raises COVID Alert Level to Medium*, WebMD, May 2, 2022.[14]

### III  Plaintiffs Jonathan Roberts and Charles Vavruska

Jonathan Roberts was born and raised in New York City. App. 45 ¶ 2. Mr. Roberts tested into the prestigious Bronx High School of Science and from there earned a math degree at Harvard—the only four years of his life in which he lived outside of New York. *Id.* He now lives in Manhattan with his wife of over 30 years. *Id.* Mr. Roberts is 61 years old, white and not Hispanic, and fully vaccinated against COVID-19 with no known risk factors for severe illness that could result from COVID-19. *Id.* ¶ 3. He does not therefore qualify for inclusion in any tier of the "risk groups" established by the State or the City for prioritization of COVID-19

---

[13]  *Available at* https://www.pbs.org/newshour/health/white-house-expands-availability-of-covid-antiviral-treatment-amid-ample-supply.

[14] *Available at* https://www.webmd.com/vaccines/covid-19-vaccine/news/20220502/nyc-raises-covid-alert-level-to-medium.

treatments. App. 46 ¶ 4. If he were any race but white, he would qualify for the last tier (1E) of the risk groups.

Charles Vavruska is an electrical engineer and a resident of Queens. App. 47 ¶ 2. A lifelong resident of New York, Mr. Vavruska is 55 years old, white and not Hispanic, and vaccinated against COVID-19. *Id.* ¶ 3. In March 2020, Mr. Vavruska contracted COVID-19 and was hospitalized for 10 days. *Id.* He has at least one risk factor (overweight and obesity) for severe illness that could result from another bout with COVID-19. *Id.* ¶ 4. He therefore qualifies for inclusion in the last tier (1E) of the risk groups for prioritization of the COVID-19 treatments at issue in this case.

Mr. Roberts and Mr. Vavruska remain at risk for contracting COVID-19. The number of cases in New York City has increased over the last two months, and "the state of emergency to address the threat and impacts of COVID-19 in the City of New York . . . remains in effect." City of New York, Executive Order No. 83 (Apr. 28, 2022).[15]

### IV. Proceedings Below

Plaintiffs initiated this civil rights lawsuit in the United States District Court for the Eastern District of New York on February 8, 2022, against Defendant Mary T. Bassett in her official capacity as Commissioner for the New York State

---

[15] *Available at* https://www1.nyc.gov/office-of-the-mayor/news/083-003/emergency-executive-order-83.

Department of Health and Defendant Department of Health and Mental Hygiene of the City of New York. Plaintiffs allege that Defendants' directives, which instruct medical providers to provide a racial preference when allocating COVID-19 treatments in times of scarcity, violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Plaintiffs promptly requested a pre-motion conference, as required by the district court judge's rules, and filed their motion for preliminary injunction soon after. After full briefing and a hearing on the preliminary injunction motion, Defendants submitted information regarding changes to the directives since they were issued in December 2021. The State Defendant asserted that it planned to issue updated guidance noting that "there is currently no shortage of the COVID-19 therapies at issue in this case" and that all patients are eligible to receive it if their practitioners deemed it appropriate. App. 247. But the State acknowledged that the updated guidance did not supersede the December 2021 directive (which continues to govern in times of scarcity), and instead acts as an update to it. App. 248. The City claims that the case is moot because its earlier-issued directive is no longer in effect, *see Roberts*, 22-710, ECF No. 33 at 2. As support, the City points to a subsequently issued directive that provides notice that one of the antivirals is

"currently in stock." *See* NYC Health, "Paxlovid is Available for COVID-19 Treatment in New York City" (2022 Health Advisory #2).[16]

The district court issued its opinion on March 15, 2022. The court dismissed the case because it concluded that Plaintiffs have not demonstrated Article III standing. App. 251–70. Plaintiffs filed a timely notice of appeal on March 23, 2022. App. 271–72.

## STANDARD OF REVIEW

This Court reviews the legal questions of whether a plaintiff has standing *de novo*. *See Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). The district court's denial of preliminary injunctive relief is reviewed for abuse of discretion, which occurs when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts. *See New York Progress and Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).

## SUMMARY OF ARGUMENT

The district court erred in dismissing the case for lack of jurisdiction. Under the familiar three-part test set forth by the Supreme Court in *Lujan*, a plaintiff has standing to raise his claims if he suffers an "injury in fact" that is both "fairly

---

[16] https://www1.nyc.gov/assets/doh/downloads/pdf/han/advisory/2022/covid-paxlovid-available.pdf

traceable" to a defendant's actions and redressable by a favorable decision from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

In this case, Plaintiffs have satisfied all three of the *Lujan* factors. As the district court acknowledged, the directives facially disadvantage Plaintiffs on the basis of their membership in a racial and ethnic group (i.e., white and non-Hispanic). App. 256–57. The injury-in-fact in an equal protection case is not the ultimate denial of the benefit, but the erection of "a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Moreover, Plaintiffs seek equal access to oral antivirals that must be taken within five days of symptom onset to treat a disease that is unpredictable and ubiquitous in nature. Thus, there is no question that the denial of equal access increases Plaintiffs' risk of illness and constitutes a concrete injury-in-fact.

Plaintiffs have satisfied their "relatively modest" burden of demonstrating that their injury is "fairly traceable" to Defendants' directives. *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)). Defendants acknowledge that they distributed the guidance to roughly 75,000 individuals, including physicians and other medical professionals. App. 55 ¶ 22. Given that Defendants are government entities that regulate the physicians and supply the treatments, it is a matter of common sense that the directives produce a

17

coercive effect on medical professionals who prescribe the COVID-19 treatments at issue. Plaintiffs' injury is also redressable by a favorable court decision. There is no evidence that providers would use race in the same way absent the directives, and in any case, "the redressability prong does not demand that court-ordered relief completely redress all injury." *Dean v. Town of Hempstead*, 527 F.Supp.3d 347, 406 (E.D.N.Y. 2021) (citing cases). Finally, the current supply of COVID-19 treatments does not render the case moot. The State acknowledges that supply shortages can occur at any time, App. 82–83 ¶ 28, and neither defendant has taken the simple step of disavowing the use of race in allocating treatments during times of scarcity. At a minimum, Plaintiffs are entitled to nominal damages against the City for subjecting them to heightened risk of illness during the months of limited supply.

On the merits, it is not close. Despite Defendants' efforts to portray their directives as suggesting that medical professionals conduct a holistic review of each patient, the directives apply race as a mechanical plus factor—in direct contravention of Supreme Court precedent. *Compare* App. 38 (using race as a risk factor for every non-white or Hispanic individual), *with Gratz v. Bollinger*, 539 U.S. 244, 271–72 (2003) (invalidating admissions policy that awarded "20 points to every single applicant from an 'underrepresented minority' group"). The violation of Plaintiffs' fundamental right to be free from racial discrimination would be itself enough to warrant a preliminary injunction. But preliminary relief is doubly warranted here

18

given the rapidly evolving and unpredictable nature of the Coronavirus pandemic and the fact that Plaintiffs' requested relief would impose minimal burdens on Defendants. Plaintiffs do not ask that Defendants refrain from instructing medical professionals to distribute COVID-19 treatments on the basis of risk factors, such as age, vaccination status, or chronic conditions. Plaintiffs simply ask that Defendants follow in the footsteps of other government entities and refrain from using race. *See, e.g.*, Utah Dep't of Health, *UDOH announces changes to risk assessment process for accessing scarce COVID-19 treatments* (Jan. 21, 2022).[17]

## ARGUMENT

I. **Plaintiffs Have Article III Standing to Raise Their Claim in Federal Court**

A. **Plaintiffs Are Injured by Defendants' Directives**

The directives injure Plaintiffs by denying them equal access to potentially life-saving medical treatments and increasing their risk of suffering from serious illness. The injury-in-fact in an equal protection case involving racial discrimination is not the ultimate denial of the benefit, but the erection of "a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Ass'n of Gen. Contractors*, 508 U.S. at 666. In the Second Circuit, a plaintiff "must allege that (1) there exists a reasonable likelihood that the

---

[17] *Available at* https://health.utah.gov/featured-news/udoh-announces-changes-to-risk-assessment-process-for-accessing-scarce-covid-19-treatments.

plaintiff is in the disadvantaged group, (2) there exists a government-erected barrier, and (3) the barrier causes members of one group to be treated differently from members of the other group." *Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994).

The district court accepted that there was a reasonable likelihood that Plaintiffs were members of the disadvantaged group. App. 256–57. Nonetheless, it concluded that it lacked jurisdiction because it was "not convinced that Plaintiffs have shown the challenged guidance either constitutes a barrier or causes one group to be treated differently from another." App. 257. It was wrong to do so.

The plain text of the directives shows that they impose a barrier to access on the basis of race. Because non-white race or Hispanic ethnicity is considered an independent risk factor and because patients seeking treatments are prioritized, in part, according to the number of risk factors they possess, the directives prioritize a non-white individual over a white individual who is identically situated in terms of age, vaccination status, and number of race-neutral risk factors.[18] In the district court, the State asserted that it is unlikely that two individuals will be competing for the

---

[18] The district court suggested that a barrier to equal treatment can only come in the form of a set-aside, *see* App. 257–58, but that is not so. *See Grutter v. Bollinger*, 539 U.S. 306, 317 (2003) (noting that the plaintiff "clearly had standing" in a case involving "holistic review" of applicants on factors including their race). In any event, because the directives at issue here involve the rote assignment of a risk factor solely on the basis of race, it is more akin to the program considered in *Gratz*, which the district court considered a barrier sufficient to establish an injury in fact. App. 258–59.

last remaining pill. App. 278 (contending that "[d]octors aren't lining up their patients and deciding who gets one last pill"). But that example is an illustration of Defendants' scheme for prioritization during times of scarcity which, by definition, means that many individuals will be competing for a fewer number of treatments.

In fact, the whole point of Defendants' directives was to funnel scarce COVID-19 treatments to those who needed it the most. App. 36 (noting that treatments "should be prioritized for patients with the highest risk of hospitalization and death"). Defendants cannot say, on one hand, that to eliminate the consideration of race would be akin to maintaining a racially discriminatory system, *Roberts*, No. 22-710, ECF No. 20, at 12–13, and on the other, suggest that their directives have little to no effect, App. 260 (proclaiming that "the guidance merely advises providers to consider race and ethnicity"); *cf. Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 518 (D.C. Cir. 2009) (finding it "more than a little ironic that [the agency] would suggest [the plaintiff] lack[s] standing and then, later in the same brief, label [the plaintiff] as a prime example of . . . the very problem the Rule was intended to address") (alterations and citation omitted). Defendants have gone to lengths in curating the distribution of COVID-19 treatments. *See supra* Statement of the Case at II. "When an agency action has a predictable effect . . . on the decisions of third parties, the consequences of those third party decisions may suffice to establish standing." *New York v. Dep't of Homeland Security*, 969 F.3d 42, 59 (2d Cir. 2020).

21

It is of little relevance that Plaintiffs have "never contracted COVID-19 nor sought out the Treatments during the period of shortage." App. 262. Plaintiffs are requesting prospective relief. As experience from the last two years has taught, COVID-19 can strike at unpredictable times. The treatments at issue here must be taken within five days of symptom onset, which would require an individual who has recently been diagnosed with COVID-19 to obtain a lawyer, file a lawsuit, seek preliminary relief, and receive a favorable decision from a court—all in less than a week. As the district court acknowledged, the time period is too fleeting for an individual to obtain meaningful relief in court after he has been infected with COVID-19. App. 264. Requiring an individual to contract COVID-19 and seek treatment before he may challenge the directives would essentially shield the directives from review.[19]

That the district court would require individuals to seek treatment to establish their standing also ignores the fact that the directives injure Plaintiffs by subjecting them to an increased risk of suffering the negative effects of COVID-19. In *Baur v. Veneman*, 352 F.3d 625, 628 (2d Cir. 2003), this Court reviewed a district court's dismissal of a citizen's lawsuit on the basis that "exposure to meat products from downed livestock was insufficient to establish a cognizable Article III injury-in-

---

[19] Further, given that there is some period of heightened immunity after contracting COVID-19, Plaintiffs have a *better* claim to prospective relief than an individual who sought treatment since the directives were published in late December.

fact." This Court reversed, holding that "exposure to an enhanced risk of disease transmission may qualify as injury-in-fact in consumer food and drug safety suits." *Id.* As particularly relevant here, this Court noted "the relevant 'injury' for standing purposes may be exposure to a sufficiently serious risk of medical harm—not the anticipated medical harm itself—thus only the exposure must be imminent, not the actual onset of disease." *Id.* at 641. Many other cases in the Second Circuit recognize that an injury-in-fact can be contingent. *See, e.g.*, *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 55 (2d Cir. 2016) ("[A] liability, including a contingent liability, may be a cognizable legal injury.") (collecting cases).

The district court also dismissed Plaintiffs' claims as a generalized grievance. App. 261–62. But as this Court noted in *Baur*, a concrete harm can be "widely shared," and "[t]he fact that many other citizens could assert the same injury, by itself, is not sufficient to defeat standing." *Baur*, 352 F.3d at 635 & n.9. Just as the consumption of downed livestock increased the risk of disease to all would-be beef eaters in *Baur*, Defendants' directives increase the risk of medical illness to white, non-Hispanic residents of New York such as Mr. Roberts and Mr. Vavruska. Just as this Court held that Baur suffered a concrete, though widely shared, injury-in-fact in his case, it should reverse the district court and hold that Plaintiffs have suffered a cognizable injury here.

The district court concluded that Plaintiffs did not suffer an "actual or imminent harm." App. 263–65. Although the Court agreed with Plaintiffs that "it is impractical to wait until a person has tested positive for COVID-19 to file suit," App. 265, it concluded that Plaintiffs' injury was not imminent because the federal government has announced that the manufacturer for one of these treatments has announced plans to provide millions of pills, App. 264–65. Yet, as the State acknowledged, supply chain disruptions can occur at any time. App. 82–83. And the uncertainty of federal funding places doubts on whether supplies will remain adequate during another surge in COVID-19 cases. *See supra* n.13.

### B. Plaintiffs' Injury Is "Fairly Traceable" to Defendants' Race-Based Directives

Plaintiffs' injury is fairly traceable to Defendants' COVID-19 directives. At the pleading stage of litigation, the plaintiffs' "burden . . . of alleging that their injury is 'fairly traceable' to" the challenged act "is relatively modest." *Rothstein*, 708 F.3d at 92 (quoting *Bennett*, 520 U.S. at 171). This Court has reiterated that the requirement is not onerous. *Carter*, 822 F.3d at 55–56. As the Supreme Court has admonished, it is "wrong[ ]" to "equate[ ] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett*, 520 U.S. at 168–69.

Even at this preliminary stage, the record shows that the City issued the directives to 75,000 providers, App. 55 ¶ 22, and the State distributed the directives

24

to "health care facilities and prescribing medical professionals in New York, including licensed physicians, nurse practitioners, and physicians' assistants." App. 247.[20] And beyond regulating the practice of prescribing physicians, Defendants here are the sole suppliers of the COVID-19 treatments at issue. Common sense thus dictates that the unequal treatment of Plaintiffs is fairly traceable to the directives, which instruct medical professionals to treat patients differently on the basis of race. As Defendants acknowledge elsewhere, differential treatment is the whole point of the exercise. The City contends that its failure to consider race in distributing COVID-19 treatments would be akin to maintaining a racially discriminatory enterprise. *Roberts*, No. 22-710, ECF No. 20, at 12–13. Both Defendants similarly acknowledge that the directives aim to get COVID-19 treatments to patients that— in Defendants' view—need them the most. Plaintiffs have sufficiently alleged some causal connection between their injury and Defendants' directives.

The district court's holding to the contrary rested on the fact that the directives do not expressly provide penalties for medical professionals who refuse to follow them. But whether Plaintiffs' injury is fairly traceable to Defendants' directives does

---

[20] The State issued a subsequent letter informing medical professionals that they need not apply the previous guidance because there was now adequate supply of the treatments. App. 247. But as the State acknowledged, the subsequently issued guidance does not supersede the directive challenged in this case, but acts as an update to it. App. 248. The challenged directive remains operative during times in which there is scarcity, which the State concedes can occur at any time. App. 82–83.

not hinge on whether the directives carry express penalties for noncompliance. If that were the law, then no one would have standing to challenge any sort of directive not backed by express penalties—even ones that instructed physicians not to treat individuals on the basis of race.

The district court also relied upon *Nat'l Council of La Raza v. Mukasey*, 283 Fed. Appx. 848, 851 (2d Cir. 2008) (summary order). Yet the Court's holding in that case was not based on the lack of express penalties, but on the plaintiffs' failure to make "any allegations supporting a reasonable inference that [the federal] defendants' actions have a determinative or coercive effect on the state and local law enforcement officers who carry out the arrests" of which the plaintiffs complain. *Id.* at 852. On the contrary, the *La Raza* plaintiffs alleged both that federal officials merely requested assistance from state and local law enforcement and that "a number of state and local authorities [chose] not to comply" with those requests "for policy reasons." *Id.* at 851–52. The Second Circuit's analysis in *La Raza* is thus unhelpful to Defendants. The court reiterated what the Supreme Court stated in *Bennett*: even an "advisory" opinion can produce a coercive effect on a third-party actor. *See id.* at 3 (quoting *Bennett*, 520 U.S. at 169).

Plaintiffs' pleadings give rise to a "reasonable inference" of a coercive effect in this case. As noted above, Defendants are regulators of the third-party medical professionals and suppliers of the COVID-19 treatments at issue in this case.

Defendants published the directives and distributed them to medical professionals across the state precisely to ensure that the treatments would be distributed to those who—in Defendants' view—were most at risk of suffering severe consequences from COVID-19. App. 36 (noting that treatments "should be prioritized for patients with the highest risk of hospitalization and death"); App. 252 (noting that "providers are instructed to adhere to the NYS DOH guidance on prioritization") (internal quotation marks deleted). Plaintiffs have met their "relatively modest" burden of alleging that Defendants' efforts to direct the distribution of COVID-19 treatments was not an exercise in futility.

### C.    Plaintiffs' Injury Is Redressable by a Favorable Court Decision

It is "likely, as opposed to merely speculative, that the [Plaintiffs'] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). The district court acknowledged that the directives placed Plaintiffs in a disfavored group for receiving COVID-19 treatments. App. 257–58. A decision enjoining Defendants from enforcing the directives will therefore necessarily redress Plaintiffs' injury by placing them on equal footing with other New Yorkers with the same medical conditions.

The fact that there are third parties involved here does not make Plaintiffs' injury any less redressable. "The redressability prong does not demand that court-ordered relief completely redress all injury." *Dean*, 527 F.Supp.3d at 406 (collecting

27

cases).[21] The district court was therefore incorrect to hold that Plaintiffs' injury was not redressable because of similar CDC Guidance and because Plaintiffs have "not alleged how practitioners would act in the absence of the guidance." App. 270. Instead, "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). In all events, the CDC guidance does not instruct providers to prioritize COVID-19 treatments based on a crude counting of the number of risk factors. *See supra* n.8. Although Defendants have widely shared their directives, App. 55 ¶ 22, App. 247, there is no evidence that the CDC distributed its guidance to medical professionals across New York. And it is Defendants, not the CDC, that directly regulate medical professionals and distribute the COVID-19 treatments in New York.[22] There is similarly no support for the counterintuitive proposition that,

---

[21] In some cases, a court order enjoining government from enforcing one rule will result in private actors doing the same. In one recent case, a federal court vacated a mask requirement for airlines, Amtrak, and other forms of public transportation. Private rideshare companies soon followed by repealing their own requirements. Jessica Flores, *Uber and Lyft have dropped their mask mandates*, SF Chronicle, Apr. 19, 2022, https://www.sfchronicle.com/bayarea/article/Uber-drops-mask-mandate-17090505.php.

[22] The district court also believed that "Plaintiff Roberts would be in the exact same situation in the absence of the" challenged directives because FDA's Emergency Use Authorization is "limited to individuals with a high risk of developing severe COVID-19, as defined by the CDC's risk factors." App. 269. Yet under the challenged directives, Mr. Roberts would be eligible for the treatments if he were

absent the directives, medical professionals will nonetheless allocate COVID-19 treatments in the way prescribed by the directives.[23]

### D.    Plaintiffs' Challenge to the Directives Is Not Moot

This case is not moot. "A case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998); *see also Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (noting that relevant question is whether the defendant's conduct has been "sufficiently altered so as to present a substantially different controversy from the one that existed when . . . suit was filed") (internal quotation marks omitted).

Here, Defendants have not chosen to alter their conduct in any meaningful respect. The State admits that although its challenged directive is not in effect while current supplies of COVID-19 treatments are sufficient, the directive has not been superseded. App. 249. In other words, the directive—and its use of racial

---

non-white or Hispanic. *See* App. 37 (establishing that individuals who are under 65 and fully vaccinated are eligible in Group 1E if they possess at least one risk factor for severe illness).

[23] *Town of Babylon v. Federal Housing Finance Agency*, 699 F.3d 221, 224 (2d Cir. 2012), is not to the contrary. The directive challenged in that case did not dictate the injury of which the plaintiff complained. Therefore, the record was clear that "even if the [directive] were vacated," the injury to the plaintiff would "remain in force." *Id.* at 230.

preferences—will dictate providers' behavior as soon as treatments become scarce. It is the same with the City's directive. Although the City contends that directive is no longer in effect, *Roberts*, 22-710, ECF No. 33 at 2, a closer examination reveals that the most recent City directive says nothing about superseding the challenged City directive in this case, and instead only provides notice that one of the antivirals is "currently in stock." *See* NYC Health, "Paxlovid is Available for COVID-19 Treatment in New York City" (2022 Health Advisory #2).[24] But as the State itself noted, supply shortages can occur at any time. App. 82–83. The City similarly acknowledges that "community transmission remains an ongoing public health concern, App. 53 ¶ 11, and cases in New York City have already increased five-fold since March. The fact that Defendants' directives will continue to apply during future shortages means the case is not moot.

At the very least, this case falls within the capable of repetition yet evading review exception to mootness. *See Irish Lesbian & Gay Org.*, 143 F.3d at 647–49. Unpredictable surges in COVID-19 cases make the dispute in this case capable of repetition. Yet, in a case like this one, fluctuations in case numbers can easily allow a dispute to evade review. *See id.* at 648 (citing cases for the proposition that "a few weeks" was "clearly insufficient for full litigation of [plaintiff's] claims").

---

[24] https://www1.nyc.gov/assets/doh/downloads/pdf/han/advisory/2022/covid-paxlovid-available.pdf

Finally, with respect to the City, Plaintiffs' request of nominal damages precludes mootness. *Van Wie v. Pataki*, 267 F.3d 109, 115 & n.4 (2d Cir. 2001). The district court's denial of nominal damages was based on its view that Plaintiffs have not been injured. But the directives increased the risk of illness to Plaintiffs in the months in which treatments were scarce. Nominal damages are therefore proper.

## II. Plaintiffs Are Entitled to Preliminary Relief

While the district court only analyzed the question of whether Plaintiffs have standing in this action when it considered the motion for preliminary injunction, full consideration of the motion is still proper in this Court. *See Cacchillo*, 638 F.3d at 405 (considering merits of preliminary injunction appeal in case in which the district court dismissed on standing).

A party seeking a preliminary injunction must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).[25]

---

[25] Second Circuit precedents "suggest that the Plaintiffs may be able to show that a preliminary injunction is warranted on the strength of the[ ] first two factors alone." *New York*, 969 F.3d at 86 & n.38.

31

### A.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on their claim that the State's and City's race-based allocations of COVID-19 treatments violate the Equal Protection Clause of the Fourteenth Amendment. All racial classifications are subject to strict scrutiny because they are "simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (internal quotations omitted).

The directives at issue contain racial classifications that "distribute[] burdens or benefits on the basis of [race]." *Id*. at 721 (citations omitted). The directives instruct health care providers to prioritize COVID-19 treatments to individuals on the basis of age, vaccination status, and risk factors such as chronic kidney disease, heart disease, cancer, and "[n]on-white race or Hispanic/Latino ethnicity." *See* App. 35–38. Because race is an independent risk factor, the directives instruct providers to allocate treatments to non-white individuals over identically situated white individuals who are the same age, have the same vaccination status, and the same number of risk factors apart from race. The directives are therefore subject to strict scrutiny. *See Mitchell v. Washington*, 818 F.3d 436, 444–46 (9th Cir. 2016) (consideration of race-related success rate of treatment as one of many factors in decision not to recommend patient for the treatment is subject to strict scrutiny).

32

Under strict scrutiny, "the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)). Defendants must show that the directives both: (1) further a compelling interest; and (2) are narrowly tailored to further those interests. They cannot do either.

**1. Race-Based COVID-19 Directives Do Not Further a Compelling Interest**

Furthering a compelling interest is necessary to "assur[e] that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality op.). The Supreme Court has recognized only two compelling interests sufficient to justify racial classifications: (1) remedying the past effects of de jure discrimination; and (2) diversity in higher education. *Parents Involved*, 551 U.S. at 720–22. Neither applies here. Instead, Defendants' use of racial classifications is based on the assertion that "longstanding systemic health and social inequities have contributed to an increased risk of severe illness and death from COVID-19." App. 35–38. But neither the City nor the State have come close to establishing the "factual predicate" for their race-based directives. *See Croson*, 488 U.S. at 498. In the district court, Defendants proffered evidence in an attempt to sustain the race-based directives. Yet the State's own evidence suggests that its race-based directive is at best overbroad.

33

For instance, the State asserts that "[p]erhaps the most convincing data point" is a chart compiled by the CDC. *See* App 79 ¶ 21. But that chart reveals that race and ethnicity are risk markers for *other* conditions or behavior that affects health, such as "socioeconomic status, access to health care, and exposure to the virus related to occupation." *Id.* And it shows that Asians whose race is considered a risk factor fare better on every measure—cases, hospitalizations, and deaths. *Id.* Other studies cited by the State suffer from similar flaws. *See* App. 77 ¶ 16 (citing CDC data that "health care and social inequities," not biological differences due to race, result in worse COVID-19 outcomes); App. 190 (not controlling for race-neutral factors in changes in life expectancy and concluding that Hispanic whites have a higher life expectancy than non-Hispanic whites despite its "disadvantaged socioeconomic profile"); App. 199 (stating that race-neutral factors such as "access to quality healthcare, general health status, education, economic stability," contribute to an increased likelihood of severe illness from members of minority racial groups); App. 216 (acknowledging that previous studies suggest disparities can be explained by factors such as socioeconomic status, lack of testing for SARS-CoV-2 infection, and virus exposure due to employment in essential-worker occupations).

### 2. Race-Based COVID-19 Directives Are Not Narrowly Tailored

Narrow tailoring requires this Court to scrutinize "the means chosen" by the government, and to ensure that they "fit th[e] compelling goal so closely that there

is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493. The Supreme Court has established several benchmarks for determining whether a law is narrowly tailored. For example, narrow tailoring requires individualized consideration. *Grutter*, 539 U.S. at 334. Using race in a rigid, mechanical way does not suffice. Narrow tailoring also demands a close fit between the ends sought by the government and the means chosen to advance those ends. For instance, race-based decision-making is unconstitutional where it is overinclusive by providing gratuitous benefits to individuals due to their race. In addition, government must engage in "serious, good faith consideration of workable race-neutral alternatives" that would allow it to achieve a compelling interest. *Id*. at 339. Race must be used only as a last resort. The directives fail on all these counts.

***First***, a narrowly tailored law provides "individualized consideration" and uses race "in a flexible, nonmechanical way." *Id*. at 334. The directives, however, use race in a rigid, mechanical manner. App. 35–38. They treat race as one risk factor for every individual who is not white—regardless of whether that person is likely to suffer adverse effects from COVID-19.

The directives' mechanical application of a racial preference is not narrowly tailored. It is instead like the unconstitutional admissions policy in *Gratz*, 539 U.S. at 271–72, which was invalidated because it automatically awarded "20 points to

every single applicant from an 'underrepresented minority' group." Similarly, the directives use race as one risk factor for *every* non-white or Hispanic individual in New York. The mindless assignment of a value to race is antithetical to narrow tailoring.

**Second**, "the means chosen [must] 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493. Yet the State's and City's use of race is overinclusive because it gives a preference to non-white individuals who are perfectly healthy. *See* App. 79 ¶ 21.

The government's use of race is also overinclusive because it grants a racial preference to every non-white racial group. Thus, even if it produced evidence to support its claim that "longstanding systemic health and social inequities" leads to "increased risk of severe illness" for members of some racial groups, it strains credulity to believe the government can do so for every non-white racial group. *See* App. 35–38. On the contrary, the "random inclusion of racial groups" for which there is no evidence of "longstanding systemic health and social inequities" demonstrates that a program is not narrowly tailored. *See Croson*, 488 U.S. at 506.

**Third**, the State and City failed to engage in "serious, good faith consideration of workable race-neutral alternatives" that would allow them to achieve a compelling interest. *Grutter*, 539 U.S. at 339. This is particularly concerning here

36

because such alternatives are readily available. For example, the government could have distributed COVID-19 treatments to those who are more likely to contract COVID-19 (e.g., those who use public transportation to commute to work or those who work in high-contact environments like grocery stores). They could also employ the same set of race-neutral risk factors already in use, including chronic diseases and obesity. Indeed, shortages in COVID-19 treatments have not been confined to New York. Most other states have not used race in allocating COVID-19 treatments, *see, e.g.*, Wash. Dep't of Health, *Interim-DOH Guidance on Prioritization for Use of AntiSARS-CoV-2 Monoclonal Antibodies* (Apr. 18, 2022),[26] and the ones that did have since reversed course, *see, e.g.*, Utah Dep't of Health, *UDOH announces changes to risk assessment process for accessing scarce COVID-19 treatments* (Jan. 21, 2022).[27] There is no reason the State and City cannot similarly disengage from the "sordid business" of "divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part).

---

[26] *Available at* https://doh.wa.gov/sites/default/files/2022-02/821-155-InterimMonoclonalAntibodyGuidance.pdf.

[27] *Available at* https://health.utah.gov/featured-news/udoh-announces-changes-to-risk-assessment-process-for-accessing-scarce-covid-19-treatments.

**B.     The Remaining Preliminary Injunction Factors Are Satisfied**

The other preliminary injunction factors are also satisfied in this case. That the directives violate Plaintiffs' fundamental right to equal protection under the Fourteenth Amendment is enough to establish irreparable harm. *Conn. Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) (noting that a violation of constitutional rights is presumed to cause irreparable harm); *Diaz v. N.Y.C. Bd. of Elections*, 335 F.Supp.2d 364, 367 (E.D.N.Y. 2004) (alleging violation of Equal Protection Clause of Fourteenth Amendment satisfies "irreparable harm" standard).

In addition, the directives increase the risk of medical illness to Plaintiffs in times of scarcity—which Defendants concede can occur at any time. App. 82–83. No amount of monetary compensation can mitigate the inability to seek potentially lifesaving medical treatment on equal footing—treatment that must be received within days of the onset of COVID-19 symptoms. *See* App. 28 (directing patients to start treatment within five days of symptom onset).

The balance of hardships and public interest factors merge in cases where the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both factors counsel in favor of preliminary relief. Absent a preliminary injunction, Plaintiffs are not assured equal access to COVID-19 treatments during a rapidly evolving pandemic. By contrast, a preliminary injunction will allow Defendants to allocate treatments on the basis of any factor except race. Finally, a preliminary

38

injunction is in the public interest, which "requires obedience to the Constitution."

*Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980).

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the district

court and remand with instructions to enter the preliminary injunction requested by

the plaintiffs.

Dated: May 12, 2022.

Respectfully submitted,

/s/ Wencong Fa
WENCONG FA
CALEB R. TROTTER
ANASTASIA BODEN
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
WFa@pacificlegal.org
CTrotter@pacificlegal.org
ABoden@pacificlegal.org

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

Type-Volume Limit, Typeface Requirements,
and Type-Style Requirements

This document complies with the type-volume limitation of Local Rule 32.1(a)(4), excluding the parts of the document exempted by Fed. R. App. P. 32(f), because this document contains 8,980 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in font style Times New Roman and font size 14.

Dated: May 12, 2022.

/s/ Wencong Fa
WENCONG FA
*Attorney for Plaintiffs-Appellants*

40

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Wencong Fa
WENCONG FA
*Attorney for Plaintiffs-Appellants*

41